IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JACKIE CARTER,

                              Plaintiff,                    OPINION AND ORDER

        v.
                                                           19-cv-057-wmc

SANDRA MCARDLE and JOLINDA
WATERMAN,

                              Defendants.

        In a prior opinion and order, the court granted *pro se* plaintiff Jackie Carter leave to

proceed on an Eighth Amendment medical care claim that defendants Sandra McArdle and

Jolinda Waterman acted with deliberate indifference to his serious medical need as an

inmate in the custody of the Wisconsin Department of Corrections ("DOC").  Before the

court are defendants' motion for summary judgment.  (Dkt. ##62, 76.)  For the reasons

that follow, the court will grant the motion, finding that the record does not support a jury

finding of deliberate indifference.[1]


UNDISPUTED FACTS[2]

**A. The Parties**

        During all relevant times for purposes of this lawsuit, plaintiff Jackie Carter was an

inmate housed by the DOC at the Wisconsin Secure Program Facility ("WSPF") located

---

[1] The court consolidated and allowed to proceed two other lawsuits that Carter had also filed against McArdle and Waterman around the same time.  (Case Nos. 19-cv-367, 19-cv-384.)  Those cases were not allowed to proceed past summary judgment.

[2] Unless otherwise noted, the court finds the following facts material and undisputed, viewed in the light most favorable to plaintiff as the nonmoving party.

in Boscobel, Wisconsin.  Defendant Sandra McArdle worked as a nurse practitioner and one of two advanced care providers ("ACPs") at WSPF from January 1, 2017, to November 2, 2019, although during this time, she was employed through a third-party contract agency rather than directly by the DOC.  Defendant Jolinda Waterman was the DOC Health Services Manager ("HSM") at WSPF from January 2015 to May 2019.[3]

### B. Provision of Medical Care Generally and Barriers to Carter's Care Specifically

As HSM, Waterman provided overall administrative support and direction for the Health Services Unit ("HSU"), working with the ACPs, dentist and outside medical specialists to provide health care at WSPF.  In that role, Waterman emphasizes that she did not personally evaluate, diagnose, determine a course of treatment, prescribe, change or alter medication, or play any other role in direct patient care.  Instead, Waterman avers, she would defer to the ACPs' decisions as to the medical diagnosis and treatment of inmates.[4]

The DOC Bureau of Health Services ("BHS") dictates special needs medical services, restrictions, medication policy and prescription guidelines, including issuing a policy governing the prescription of opioids.  Here, too, Carter purports to dispute this fact

---

[3] Although the time period falls outside of the scope of his claims, plaintiff also avers that Waterman was previously employed as a nurse at WSPF in 2005 or 2006.

[4] Carter purports to dispute this fact, representing that Waterman "[a]llowed the [a]lteration of my medication" and "drew my [b]lood many times."  (Pl.'s Resp. to Waterman's PFOFs (dkt. #94) ¶ 5.)  Waterman also avers that only the Medical Director, not herself as the HSM, had any direct supervisory control over the ACPs, which Carter purports to dispute as well, stating without any support that Waterman had supervisory control over McArdle.

on the basis that HSU Manager ("HSM") Waterman had a "special need[s] committee made up of non-medical staff members" at WSPF, and "the BHS ok'd the opioid prescriptions once they were prescribed." (Pl.'s Resp. to Waterman's PFOFs (dkt. #94) ¶ 9.) Defendants also represent that BHS makes changes to the policies and guidelines over time, and that these changes could cause an adjustment to an inmate's medication because of a formulary change or a new process for approval of a prescription, although Carter purports to dispute this based on his unsupported statement that BHS policy changes did not affect his prescriptions.

In addition to BHS changes, Carter's medications could change because of a medical determination from an ACP. For example, on February 11 2019, Dr. Gavin halted Carter's Tramadol prescription, a pain reliever in the opioid analgesics group, because of lab results showing worsening kidney function. In response to this proposed finding, Carter contends that *McArdle* originally terminated that prescription, and Dr. Gavin then renewed it, only to have McArdle convince Gavin to "terminate [the prescription] so it wouldn't show what defendant McArdle was doing to me." (Pl.'s Resp. to Waterman's PFOFs (dkt. #94) ¶ 12.) Again, however, Carter provides no support for his belief.

An inmate's refusal to attend appointments, engage in treatment, or agree to lab work or pre-operative testing can affect his medication and treatment. In response, Carter does not dispute this as a general consequence, but contends that *he* only refused treatment when provided by McArdle because she was hurting him and his requests for an escort were refused. Specifically, HSM Waterman represents that Carter's refusal to attend his pre-operation appointments led to the UW Hospital canceling a scheduled operation to address

3

his stomach issues with a ventral hernia repair and underlying mesh, while Carter blames defendants' refusal to provide him an escort. Moreover, Waterman avers that Carter's refusals to repeat lab work to assess kidney function delayed his medications being prescribed or continued. Carter contends that he was never informed of the need for these tests.

Finally, Waterman contends that Carter refused to be evaluated or measured for orthotics and braces, and he misused and altered the equipment he was provided, leading to delays in providing equipment he requested. For his part, Carter contends that he was *instructed* to send in equipment to be replaced, at which time, defendants lied and said he had altered it to justify their reason for refusing to return it to him.

When an inmate feels that his medical issues have gone unaddressed by an institution's ACPs or HSU as a whole, he can submit an inmate complaint to an Institution Complaint Examiner ("ICE"), who is charged with investigating. While Carter does not dispute that medical issues can be raised in an inmate complaint, he contends that because of nepotism, complaints against staff are not properly investigated. For example, Carter points out that he submitted 13 inmate complaints regarding his medical care between June 2017 and March 2019, all of which were either dismissed or rejected by ICE and again on appeal. Moreover, as HSM, ICE would sometimes contact Waterman if an inmate's complaint concerned medical issues or services.

In particular, as part of her responding to the ICE investigation of Carter's many complaints, HSM Waterman reviewed the record and provided a synopsis to the ICE. If the ICE requested, she would also follow-up with Carter either in writing or in person to

4

explain why a medical decision had been made.  As such, Waterman was aware of Carter's chronic conditions, as well as his extensive medical treatment at WSPF and from outside specialists.  Carter further contends that Waterman used her knowledge of his medical conditions and care to cause him suffering and pain.  In response, Waterman avers that at no time did she alter or modify Carter's medical records or believe that he was not receiving appropriate care, including with respect to his complaints about abdominal pain or its treatment.

### C. Hernia Mesh Repair Surgery

More specifically, defendants point out that Nurse Practitioner McArdle evaluated Carter's complaints of abdominal pain several times, ordered imaging studies and an abdominal ultrasound, *and* referred him to a surgeon.  Although Carter does not dispute these actions, he contends that McArdle at least initially denied knowing mesh had already been placed in Carter's abdomen to fix a hernia.  Moreover, while an October 10, 2017, CT showed no hernia, but rather that the mesh was working and properly located, another CT scan on May 17, 2018, showed a hernia.  For this reason, on September 5, 2018, Dr. Greenberg, a specialist at the University of Wisconsin ("UW") Hospital, recommended surgical repair of Carter's complex ventral hernia and excision of the hernia mesh.  At that point, McArdle placed the order for the surgery, and WSPF HSU staff scheduled it.

Before the surgery, however, UW Hospital required Carter to complete documentation of his medical history and have a physical examination with a WSPF provider.  Carter refused his pre-operative appointment on October 5, 2018, and again when it was rescheduled three, different times:  October 11, October 16, and October 29.

Carter admits that he refused the first appointment but contends he did so because HSM Waterman refused to provide him with an escort.  Regardless of the reason for it or the number of times he did so, Carter's refusal to attend a pre-operation appointment resulted in his surgery being canceled, although Carter contends that he refused just one time, then "begged to be seen over and over again" for a year and a half.  (Pl.'s Resp. to Waterman's PFOFs (dkt. #94) ¶ 25.)

On December 15, 2018, Carter wrote a health services request ("HSR") and asked whether his hernia surgery had been canceled.  An HSU staff member responded that his surgery had been canceled by UW due to Carter's refusal to complete his medical history and sit for a physical with his WSPF provider.  Carter wrote additional HSRs about various issues on December 30, 2018, as well as January 8 and January 16, 2019.  Carter was then scheduled to see Dr. Gavin on January 29, 2019, which he attended.  At that appointment, Dr. Gavin explained to Carter the need for the pre-operative clearance appointment, to which Carter indicated that he both understood and agreed to an appointment for that purpose.  In response, Carter does not dispute this, but avers that he also informed Dr. Gavin that she was being manipulated by Nurse Practitioner McArdle.  Finally, Carter now challenges why Dr. Gavin did not administer his physical that day, rather than having him wait nine more months before doing so.[5]

---

[5] Certainly, the need to hold off the physical until close to the yet-to-be-approved operation date makes sense, but defendants do not explain why it took some nine months for the surgery to be rescheduled.  Still, as explained below, the record does not permit a finding that any delay was due to deliberate indifference on the part of the named defendants.

Once Carter voiced his agreement to participate in a pre-operative physical, WSPF began the process for rescheduling his hernia repair surgery at the UW.  On September 12, 2019, Carter completed his history and physical and it was recommended that he go ahead with his surgery scheduled for September 25, 2019.  On his part, Carter does not dispute these events, but represents that for the September 12 physical appointment with McArdle, an escort was present.

On October 3, 2019, Carter was discharged from UW Hospital to WSPF "in good condition, able to feed himself a general diet, ambulate without assistance, with adequate pain control, and with good bowel and bladder habits."  (Waterman's PFOFs (dkt. #64) ¶ 31 (citing Bachhuber Decl., Ex. 1006 (dkt. #66-3) 162).)  Carter does not dispute that the medical record states as much, but contends that he was *not* in a good condition upon release.  Specifically, Carter represents that he had difficulty using the toilet in his cell, had fluid leaking from two holes in his stomach, had difficulty eating the meals provided, and could not ambulate without assistance.  As support, Carter further points out that during his surgery a foot of his intestines were removed.  A contemporaneous description of the surgery also provides that Carter underwent a small bowel resection.  (Bachhuber Decl., Ex. 1006 (dkt. #66-3) 162.)

### D. Administration of Pain Medication

In late 2017, Nurse Practitioner McArdle had weaned Carter off Tramadol in anticipation of a scheduled foot surgery, explaining to him that controlled medication use could risk the effectiveness of anesthesia.  Carter disputes the reason for the termination of the prescription, averring instead that McArdle "'created' every chance that she could

[to] create some sort of excuse to terminate my known needed pain medication." (Pl.'s Resp. to McArdle's PFOFs (dkt. #100) ¶ 6.)  In response, McArdle claims that Carter ultimately elected to cancel the surgery, and the Tramadol was subsequently re-prescribed.

From March 2018 to November 2018, even though Carter was officially assigned to McArdle -- based on the terminal digit of his inmate number -- Carter primarily saw the other ACP at WSPF at that time, Dr. Patterson, after Carter had expressed dissatisfaction with McArdle's demeanor.  Thus, for this six-month period, Dr. Patterson managed Carter's care.  Carter does not appear to dispute this fact, but contends that McArdle would terminate prescriptions once another doctor left WSPF.  In this case, McArdle represents that it was Dr. Patterson who failed to renew Carter's prescription for Tramadol before he left his employment with WSPF, which meant that McArdle needed to perform an evaluation before again prescribing him Tramadol.  However, Carter then refused to be evaluated by McArdle.  Carter does not dispute this, but explains this was because he refused to allow McArdle to hurt him.

On December 30, 2018, therefore, Carter submitted an HSR requesting Tramadol. As HSM, Waterman then investigated Carter's request, reviewed his medical records, and determined that this request had not been presented to the special needs committee by his ACP.[6]  Waterman further determined that Carter's medical records did not show any indication for Tramadol, and Carter had refused an evaluation to determine whether this

---

[6] Carter disputes this on the basis that he received Tramadol before leaving the prison for surgery, and while he was in the hospital, but it appears that his response was based on a mistake as to the date of the surgery, since Waterman represents that Carter's request was made in December 2018; Carter's surgery was not until September 2019.

medication was medically appropriate.  Moreover, there appears no dispute that Waterman explained to Carter that he needed to be evaluated to renew medications, and given his refusal to be seen by McArdle for evaluation, his Tramadol prescription could not be renewed, although Carter disputes that he was refusing anything except being seen by McArdle.  Nurse Practitioner McArdle also avers that Carter's lab work showed poor kidney function, which meant that narcotic use like Tramadol was discouraged as it could worsen his kidney function and adversely affect his body's ability to metabolize and excrete the medication.[7]

On January 25, 2019, during an appointment with a nurse, Carter again complained of pain and requested an opioid medication, but the nurse noted that he showed no signs of pain with movement.  In response to his January 27, 2019, HSR, in which Carter again complained of pain, Waterman responded that he could address this issue at his upcoming appointment with a new ACP, Dr. Eileen Gavin, and during his January 29 appointment with Dr. Gavin, she and Carter discussed his chronic pain.  At that appointment, Dr. Gavin also set a plan for Carter to seek approval for Tramadol and for an epidural steroid injection.  The next day, January 30, Carter again submitted an HSR requesting Tramadol.  Moreover, Carter requested Tramadol through additional HSRs on January 31, February 1 and February 7, 2019.

On February 11, 2019, Dr. Gavin responded to Carter in writing about his request for Tramadol, indicating that she reviewed his most recent laboratory results showing his kidney functioning was worsening.  After conducting research, Gavin also determined that

---

[7] As context, Carter has kidney disease.

Tramadol use by someone like Carter with kidney disease and deteriorating kidney function can be a problem, due to how the drug is metabolized and excreted from the body. In particular, Gavin learned and informed Carter that Tramadol could cause seizures and impair his ability to breath properly.  Carter purports to dispute this, arguing instead that it was actually defendants Waterman and McArdle who were involved *and* that he was not informed of Dr. Gavin's concerns, but this is belied by the record.  (Bachhuber Decl., Ex. 1000 (dkt. #17-1) 41.)    Indeed, on February 14, Dr. Gavin *again* wrote to Carter in response to another HSR, explaining that she understood that he was in pain, but could not emphasize enough how much his kidney function had deteriorated in a short period of time.  (*Id.* at 33, 37.)  Gavin also informed Carter of his upcoming appointment with nephrology, and that she had scheduled another blood draw to check his kidney function. Finally, Dr. Gavin stated in her professional opinion that Carter's kidney disease was more significant than his pain, and that prescribing Tramadol could potentially make a bad situation worse.

Instead of Tramadol or other narcotic, therefore, on March 11, 2019, Carter was approved for non-formulary prescription gabapentin for his pain.  Although there is no HSU or inmate complaint documenting his doing so, Carter purports to have disputed this prescription, representing that he is "not allowed to take that." (Pl.'s Resp. to Waterman's PFOFs (dkt. #94) ¶ 48.)  Regardless, on April 3, 2019, Carter was seen by the Gunderson Health Nephrology Department.  That specialist recommended Carter have lab work completed before reviewing and adjusting his medications.  In the meantime, the specialist recommended that Carter use Acetaminophen or Tylenol for pain, rather than Advil or

Ibuprofen, and that a follow-up appointment be scheduled in three months.  Again without contemporaneous documentation, Carter purports to dispute this proposed finding on the basis that he is "not allowed to take any of that."  (*Id.* ¶ 49.)

In fairness, following his appointment at Gunderson, Carter did send several more HSRs for a Tramadol prescription.  However, in response, Carter was advised to take Tylenol for his pain, as the Gunderson nephrologist recommended, and to begin a special diet.  As also recommended, HSU staff explained that his kidney function would be retested to see if additional pain medication could be added.

Although scheduled to complete the requested lab work on April 17, 2019, Carter refused the appointment due to "flu-like" symptoms.  Carter also contends that defendants refused to allow him to use the wheelchair, making him miss appointments.  Regardless, on April 24, Carter again refused to complete his lab work.  This lab work would also have included a Pregabalin (or Lyrica) level test, and unfortunately, an inmate's refusal of lab work is grounds for discontinuation of Pregabalin due to potential misuse.  As a result of Carter's refusal,[8] his Pregabalin prescription was discontinued, and without a kidney function test, the provider was unable to consider whether a Tramadol or other narcotic prescription had become medically appropriate.  Without disputing these repeated refusals to be tested, Carter responds that every time defendants "got upset," they took away another medication.

---

[8] Carter contends that McArdle created a false story to hurt him, but his refusals to complete lab work does not appear to be in dispute.

11

On May 10, 2019, Carter similarly appears to have refused an appointment to address his chronic pain and headaches.  However, on May 20, 2019, Carter agreed to be seen by Nurse Practitioner McArdle to discuss his Tramadol and Pregabalin prescriptions. Carter does not dispute this, although by way of explanation, he points out that this appointment had been facilitated by the new Health Services Manager, Jaime Adams, who was Waterman's replacement.  During that appointment, Carter also agreed to have his blood drawn on May 22.  Because the lab work showed improvement in his kidney function, allowing McArdle to restart his Tramadol prescription.  However, because Tramadol is a controlled medication, this prescription required authorization by the Class III Committee, which sometimes delays fulfillment.  In addition, on May 24, Carter was seen again by McArdle, this time to review and sign a chronic pain management agreement. At that appointment, McArdle also explained to Carter that his kidney functioning would continue to be monitored to ensure the safe use of Tramadol.  McArdle then prescribed Tramadol two 50 mg tablets to be taken up to three times a day as needed.  Carter again argues that it was Adams who "made this happen."  (Pl.'s Resp. to Waterman's PFOFs (dkt. #100) ¶ 58.)

In any event, Carter resumed taking Tramadol on June 1, 2019.  On May 20, McArdle also sent a non-formulary request for Carter to restart Pregabalin.  After that request was approved on June 10, Carter began taking Pregabalin again on June 15.

### E. Orthotics and Braces

During this same time frame (January 2015 to May 2019), Carter was serving time in restrictive status housing, which has different rules regarding property than the general

population.   In particular, there are restrictions on braces and shoes with laces. Nonetheless, on March 14, 2019, Carter was provided his bilateral knee braces, bilateral ankle braces, orthotics and blue hi-top sneakers.  Carter does not dispute this, but contends that he was always allowed these items in segregation, and defendants had actually wrongfully denied them for four months.  Carter also had a wheelchair available to him for longer distance travel within WSPF, and Waterman offered him black apex medical shoes purchased through health services, but Carter refused.  Finally, Carter's back support was discontinued due to evidence of misuse, and he refused to meet with McArdle for its reinstatement.

## OPINION

Plaintiff contends that defendants violated his Eighth Amendment rights by failing to provide appropriate medical treatment, and in particular, by (1) failing to treat his hernia mesh infection, (2) refusing to administer prescription pain medication, and (3) denying him access to orthotics and braces.  As the court explained in its prior opinion and order granting Carter leave to proceed on these claims, the Eighth Amendment affords prisoners a constitutional right to medical care.  *See Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  To *prove* his claims, however, plaintiff must demonstrate as to each that:  (1) he had an objectively serious medical need; and (2) defendants were deliberately indifferent to it.  *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

"A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person

13

would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).  For purposes of summary judgment, defendants do not dispute that plaintiff suffered from objectively serious medical needs.  Instead, defendants seeks summary judgment on the basis that they were not deliberately indifferent to his needs.

As for this second element of deliberate indifference, a defendant must be subjectively aware of an inmate's serious medical need -- that is, she must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Thus, deliberate indifference constitutes more than negligent acts, or even grossly negligent acts, but may require something less than purposeful acts. *Id.* at 836.  The point of division between these two acts lies where (1) "the official knows of and disregards an excessive risk to inmate health or safety," or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," yet deliberately fails to take reasonable steps to avoid it. *Id.* at 837.

As just outlined, plaintiff asserts an Eighth Amendment claim based on three, different medical needs.  Thus, the court addresses each in turn, while considering separately the personal role, if any, played by either defendant.

## I.  Hernia Mesh Repair Surgery

As detailed in the facts above, Carter had hernia repair surgery at some point well

before the relevant events in this case, including the placement of a mesh.[9]   On October 10, 2017, a CT showed that the mesh was working, was properly located, and did not show a hernia.   However, approximately six months later, another CT scan showed a hernia. Carter was next referred to UW Health, and on September 5, 2018, Dr. Greenberg recommended surgical repair of Carter's complex ventral hernia and excision of the hernia mesh.   McArdle placed the order for the surgery, while HSU staff scheduled it.   None of these facts appear to be in dispute, nor do they support a finding of deliberate indifference against either defendant.

In advance of his surgery, Carter was required to have a pre-operative appointment with his WSPF provider, including a physical examination.   As detailed above, however, Carter refused to attend this appointment.   While he contends this refusal only applied to one appointment, and defendants contends that he refused three, additional rescheduled appointments with Nurse Practitioner McArdle, this dispute is not material because defendants represent, and plaintiff did *not* dispute, that his refusal to sit for a pre-operative appointment was the cause of his October 2018 surgery being canceled, and defendants cannot be liable for deliberate indifference if plaintiff refused to participate in his own treatment.   *See Walker v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (finding no deliberate indifference when inmate refused to take preliminary test necessary for diagnosis before beginning treatment); *see also Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006)

---

[9] While not part of defendants' proposed findings, the court notes that the records from UW Health reflect that Carter had a hernia repaired in 2004, which was again repaired in 2006, at which point a Composix™ mesh was placed.  (Bachhuber Decl., Ex. 1006 (dkt. #66-3) 161.)  "Since that time he had had intermittent drainage from the mesh."  (*Id.*)

(refusing to find deliberate indifference where the record showed repeated instances of the plaintiff refusing medical assistance offered to him and refusing doctor-ordered x-rays to assist in determining whether he suffered any broken bones).

Carter also contends that he refused to attend the pre-operative appointment with McArdle because defendants refused to provide him with an escort. As far as the court can discern, Carter insisted on an escort because of his belief that McArdle would somehow harm him during the appointment, which in turn appears based on his belief that McArdle purposefully withheld pain medication and other medical treatment to hurt him. Any such belief, however, is based on pure speculation, which is not sufficient for a reasonable jury to credit, much less to hold *defendants* responsible. *See Davis v. Gee*, No. 14-CV-617-WMC, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (rejecting plaintiff's argument that there was a conspiracy within the prison involving falsifying medical records, because "these allegations are also based on little more than speculation, which is insufficient to manufacture a genuine issue of fact at summary judgment") (citing *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).

Eventually, after meeting with a new ACP, Dr. Gavin, in late January 2019, Carter agreed to attend a pre-operation appointment. However, for reasons that are not clear from the record, and for which defendants offer no explanation, there was a nine-month delay in rescheduling the offsite surgery at UW Health, and in turn, a pre-operation examination by an ACP at WSPF before that surgery. While Carter complained about the delay in surgery between the time it was canceled and his appointment with Dr. Gavin as described above, the record reflects that Carter stopped complaining about his hernia mesh

16

issue and need for surgery for over three months, instead focusing his energy on his other, numerous medical issues.   In particular, it was not until May 10, 2019, that Carter submitted another HSR renewing this issue, albeit one that stated his "hernia is again infected, swollen and on the verge of bursting again." (Adams Decl., Ex. 1002 (dkt. #40-1) 171.)  In response, Carter was seen by Nurse Practitioner McArdle on May 20, 2019, at which time she agreed to "check with the scheduler on the upcoming date that his surgery for the removal of the mesh is scheduled." (*Id.* at 21.)  Carter next submitted an HSR on June 20, 2019, complaining again about his hernia mesh.  (Bachhuber, Ex. 1006 (dkt. #66-3) 403), but at that point HSU Manager Waterman was no longer working at WSPF.  Finally, in response to a July 25, 2019, HSR, Carter was informed that his surgery would take place in September (*id.* at 370), which it did.

At most, therefore, this record permits a finding that HSU acted negligently in rescheduling his surgery -- and it's not clear who at HSU is responsible for this delay. Regardless, there is no evidentiary basis from which a reasonable jury could find either defendant named in this case deliberately indifferent in their care of Carter's hernia mesh infection from the end of January 2019, when he finally agreed to cooperate with a pre-operative exam, and his eventual surgery in September 2019.  *See Farmer*, 511 U.S. at 837 (requiring evidence that a defendant is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," yet deliberately fails to take reasonable steps to avoid it to demonstrate deliberate indifference).  Far from it, as set forth above, defendant McArdle played almost no role in Carter's health care after being effectively

17

"fired" from his health care team in September of 2018, and defendant Waterman was gone from WSPF altogether by May of 2019.[10]

## II.    Administration of Pain Medication

Over this same period of time, Carter also faults defendants for mismanaging his prescription medications and denying him Tramadol and other prescription pain medication.  In reviewing the record, there appear to be four time periods in which Carter was denied prescription pain medication.  *First*, in 2017, McArdle discontinued Carter's Tramadol prescription in advance of planned foot surgery.  Carter disputes the reason for the termination of the prescription, averring instead that McArdle "'created' every chance that she could [to] create some sort of excuse to terminate my known needed pain medication."  (Pl.'s Resp. to McArdle's PFOFs (dkt. #100) ¶ 6.)  Here, too, the court concludes that this speculation on Carter's part does not create a genuine dispute of material fact.  Moreover, once he decided to not pursue surgery, there is no dispute that his Tramadol prescription was reinstated.

*Second*, in November 2018, Carter's Tramadol prescription ran out when another ACP Dr. Patterson failed to renew Carter's prescription for Tramadol before he left his employment with WSPF.  Again, Carter attempts to dispute this fact, asserting instead that McArdle would terminate prescriptions once another doctor left WSPF.  Again, however, Carter's assertion is based on his own speculation, not on personal knowledge that would create a genuine issue of material fact.  McArdle further explains that in order

---

[10] In fact, the entirety of this delay in rescheduling Carter's hernia surgery all post-dates his filing of this lawsuit in January of 2019.

to renew his prescription, she needed to evaluate Carter and he refused the appointment, which is *not* in dispute.  Rather, Carter contends, also without any factual basis, that he refused to allow McArdle to evaluate him to keep her from hurting him.  As described above, defendants cannot be liable for deliberate indifference where plaintiff refused to engage in his medical treatment based on his own unsubstantiated fears.  *See Pinkston*, 440 F.3d at 892; *Walker*, 233 F.3d at 500.

*Third*, after Carter refused to be seen by McArdle, he was eventually seen by a new ACP, Dr. Gavin, in late January 2019.  Based on kidney functioning tests at that time, Dr. Gavin, *not* defendants, made the decision in February 2019 not to renew his prescription of Tramadol until Carter saw a nephrologist.  While Carter attempts to place the blame on McArdle and Waterman by claiming that Dr. Gavin was manipulated by defendants, there is no evidence to support this opinion, and, again, his speculation fails to create a genuine issue of material fact.

*Fourth*, in late April 2019, after Carter was seen by a nephrologist paving the way for a possible prescription, Carter refused to have his blood drawn not only to check his kidney functioning levels but also to test his Pregabalin (or Lyrica) level.  Based on the lack of testing, McArdle made the decision to discontinue his Pregabalin prescription and refused to restart Tramadol.  However, by May, Carter had agreed to meet with McArdle, with the assistance of the new HSM, and he also agreed to blood work. As a result, both his Pregabalin and Tramadol prescriptions were restarted.

For each of these events, therefore, a reasonable jury could not find that defendants were deliberately indifferent to Carter's pain by refusing to prescribe him or facilitate

prescriptions for pain medication.  To the contrary, the undisputed record establishes that decisions to terminate or not renew pain medications were made because of Carter's refusal to cooperate in his medical treatment, or by non-defendants for apparently legitimate reasons (e.g., concerns about Carter's kidney functions on the part of Dr. Gavin).  At most, any discontinuation of Carter's pain medications appear to have been cause by the negligence of other ACPs (e.g., Dr. Patterson's failure to renew the prescription before his departure).

## III.    Orthotics and Braces

Finally, Carter complains that Waterman and McArdle confiscated or refused to provide various orthotics and braces for a four-month period.  Once again, however, Carter fails to present any *evidence* from which a reasonable jury could infer that Carter was denied these devices because of the defendants' actions.  Rather, the denials appear to have been caused by Carter's being moved to restrictive housing for discipline reasons.  Moreover, even Carter does not dispute that his back support was discontinued due to evidence of misuse, and he refused to meet with McArdle for reinstatement of that brace.  On this record, therefore, a reasonable jury could not find that any denial of orthotics and braces was because of defendants' actions.  As such, the court will grant summary judgment to defendants as to this claim as well.

## IV.    Plaintiff's Renewed Motion for Recruitment of Counsel

In addition to defendants' motion for summary judgment, plaintiff has also renewed his motion for assistance in recruiting counsel.  (Dkt. ##88, 106.)  The court previously

denied plaintiff's request for assistance in recruiting counsel, noting that plaintiff appeared capable of responding to defendants' motions for summary judgment.  (2/19/20 Order (dkt. #72) 8-10.)  Moreover, rather than relying on plaintiff's summary judgment submissions, the court combed his medical and inmate-complaint records to have a more robust understanding of plaintiff's claims and the evidence he could marshal to support his claims. Having done this work, the court concludes that recruitment of counsel was unnecessary, and having now granted defendants' motions for summary judgment, the court will deny his remaining requests for recruitment of counsel as moot.

## ORDER

IT IS ORDERED that:

1) Defendant Jolinda Waterman's motion for summary judgment (dkt. #62) is GRANTED.

2) Defendant Sandra McArdle's motion for summary judgment (dkt. #76) is GRANTED.

3) Plaintiffs' renewed motions for assistance in recruitment of pro bono counsel (dkt. ##88, 106) are DENIED AS MOOT.

4) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 14th day of October, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge